GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ROBERT A. GOODIN, State Bar No. 061302
FRANCINE T. RADFORD, State Bar No. 168269
505 Sansome Street, Suite 900
San Francisco, California 94111
Telephone:    (415) 392-7900
Facsimile:    (415) 398-4321

Attorneys for Plaintiff
BERNARD OSHER TRUST
DTD 3/8/88, BERNARD A. OSHER, TRUSTEE

**FILED**
APR - 1 2009
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| BERNARD OSHER TRUST DTD 3/8/88, BERNARD A. OSHER, TRUSTEE,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF ALAMEDA, CALIFORNIA, on behalf of itself and ALAMEDA POWER & TELECOM, a department of the City of Alameda; ALAMEDA PUBLIC FINANCING AUTHORITY; ALAMEDA PUBLIC IMPROVEMENT CORPORATION; and STONE & YOUNGBERG, LLC, a California Limited Liability Company,<br><br>Defendants. | Case No. CV 09 1437 EMC<br><br>**COMPLAINT**<br><br><u>**DEMAND FOR JURY TRIAL**</u> |

Case No.
COMPLAINT; DEMAND FOR JURY TRIAL

# INTRODUCTION

In 2000, the City of Alameda decided to enter into the telecom business. To fund that venture, the City borrowed $16 million from Citibank, repayment of which was due in May 2004. As that date approached, and it was clear that the City's telecom venture was a losing proposition, the City became concerned that Citibank would take over the Telecom System, sell it, and access the assets of Alameda Power & Telecom's Electric Division to pay off the shortfall. To avoid that outcome, the City concocted a scheme to raise sufficient funds to pay off the Citibank loan and protect the Electric Division's assets. The City thereupon issued $33 million in municipal revenue bond anticipation notes, the proceeds of which were to be used to pay off Citibank, provide additional funds to complete the system, and to capitalize the interest payments to investors. The City represented that it would operate the system so as to render it sufficiently profitable to obtain new financing in 2009 through the sale of long term municipal revenue bonds in order to repay the principal. The City, however, knew that the system was never going to achieve the results needed to obtain that financing in 2009 or any other time, because the system was not economically feasible, for a number of reasons detailed below, all of which were known to the City. The City simply planned that the losses incurred by the inevitable sale of the system would impact pockets other than its own. To accomplish its goal, the City falsely represented to potential investors that there were risks involved in the project, when in truth, the project was not risky, but rather, a surefire loser, and the City was effectively abandoning it as such.

The Plaintiff here is a revocable living trust with a long history of purchasing municipal bonds based on the trusted advice of the underwriter defendant, Stone & Youngberg. As the underwriter, and as an advisor in which Plaintiff reposed trust and confidence, Stone & Youngberg had a fiduciary duty to investigate the representations made by the issuer of the Notes, and fully and fairly disclose all material facts to potential investors. Stone & Youngberg either aided and abetted the City in its fraud, knowing, as the City did, that the project was not economically feasible, or, in the alternative, Stone & Youngberg failed utterly in its duty to undertake due diligence to unearth the City's misrepresentations and omissions of material fact.

-1-   Case No.
COMPLAINT; DEMAND FOR JURY TRIAL

## JURISDICTION AND VENUE

1. This Court has federal question jurisdiction pursuant to the Securities Exchange Act of 1934, 15 U.S.C. § 78aa and 28 U.S.C. § 1331. This Court has jurisdiction to hear and determine the Plaintiff's pendent state law claims for relief arising under the state securities acts of California, for common law fraud, aiding and abetting common law fraud, negligent misrepresentation and breach of contract in that such claims arise from a common nucleus of operative facts and are so intertwined as to make the Court's exercise of jurisdiction appropriate.

2. Venue of this action lies in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in this District.

## INTRADISTRICT ASSIGNMENT

3. On July 30, 2008 Vectren Communication Services filed a Complaint for Breach of Contract ("the Vectren Action") against the City of Alameda, acting by and through Alameda Power & Telecom in the Northern District of California (Case No. C 08 3137 SI) which case was assigned to the Honorable Susan Illston.

4. On October 1, 2008 the City of Alameda, California, Alameda Power & Telecom, Alameda Public Financing Authority, and Alameda Public Improvement Corporation (collectively "the City") filed a declaratory judgment action ("the City Action") (Case No. C 08 4575 JCS) which case was deemed to be related to the Vectren Action and assigned to Honorable Susan Illston. A counterclaim in the City Action (the "Nuveen Counterclaim") was filed by Nuveen Municipal High Income Opportunity Fund, the Nuveen Municipal Trust on behalf of its series Nuveen High Yield Municipal Bond Fund and Pacific Specialty Insurance Company, who collectively purchased $20.5 million of the Notes which are the basis for the City Action and the Nuveen Counterclaim.

5. Plaintiff's claims alleged herein arise out of the same nexus of facts and legal claims as the Vectren Action, the City Action and the Nuveen Counterclaim (specifically, the purchase by Plaintiff of Notes with a face amount of $8.950 million) is related to these actions

-2-     Case No.
COMPLAINT; DEMAND FOR JURY TRIAL

within the meaning of Civil L.R. 3-12(a), and therefore assignment to Honorable Susan Illston's division is appropriate pursuant to Civil L.R. 3-2(c) and 3-12(a).

### PARTIES

6. Plaintiff Bernard Osher Trust Dtd 3/8/88, Bernard A. Osher, Trustee ("Plaintiff" or "Osher") is a California revocable living trust.

7. The City of Alameda ("City"), is a charter city under the California Constitution. As alleged in more detail below, the City of Alameda caused the Alameda Public Financing Authority to issue the Notes described herein as part of the initial public distribution of the Notes.

8. Alameda Power & Telcom ("AP&T") is a department of the City that was, at all times pertinent to the claims asserted herein, controlled by the City and has, for many years, served as an electric utility provider. Beginning in 2000, AP&T also became a provider of telecommunication services. The two divisions of AP&T are referred to as the "Electric Division" and "Telecom System."

9. Alameda Public Financing Authority (the "Authority") is a public corporation and City instrumentality created to aid the City in the performance of its fiscal duties that was empowered by the City to raise capital and issue the Notes. The board of directors of the Authority was the Alameda City Council. The City directly and indirectly controlled the Authority at all times pertinent to this Counterclaim.

10. Alameda Public Improvement Corporation ("APIC") is a nonprofit public benefit corporation subject to the direction of the Mayor and the members of the Alameda City Council ("City Council") (who also serve as the board of APIC) that entered into the Installment Sale Agreement with respect to the issuance of the Notes.

11. All of the actions and representations of AP&T, the Authority and APIC alleged in this Complaint were directed, authorized and approved by the City acting through its Mayor and City Council. Any of such actions that were not directed, authorized and approved by the City were ratified by the City. The City, AP&T, the Authority and APIC are referred to collectively herein as the "City Defendants."

1   12.   Stone & Youngberg, LLC ("Stone & Youngberg") is a California limited liability company and registered broker-dealer that, at all times pertinent to this Counterclaim, maintained its principal place of business in California. As the underwriter of the Notes, Stone & Youngberg was the principal author of the Official Statements, purchased the Notes from the Authority and offered and sold Notes with a face amount of $8,950,000 to Osher. The City Defendants and Stone & Youngberg are sometimes referred to herein collectively as "Defendants."

## COMMON ALLEGATIONS

13.   In 1998, Alameda voters approved the creation of a cable television division within AP&T, after which the City began laying fiber-optic cable for the Telecom System. In June 1999, AP&T contracted with Vectren Communication Services, Inc. ("Vectren") for the installation and management of the Telecom System. AP&T financed construction of the Telecom System in December 2000 by issuing $16 million of Series 2000B Certificates of Participation ("2000B COPS") that were purchased by Citibank.

14.   The 2000B COPS were due to be repaid in 2004 and were secured by the Telecom System to the extent that Citibank could take the Telecom System, sell it and use the proceeds to repay the 2000B COPS in the event the City was unable to otherwise repay the debt. Moreover, a security agreement entered into in connection with the 2000B COPS with the City Defendants gave Citibank a continuing lien on and security interest in all of AP&T's accounts, property, and proceeds thereto.

15.   In early 2002 AP&T and Vectren entered into a contract amendment (the "Vectren Agreement") which resulted in AP&T assuming total responsibility for the completion, management and operation of the Telecom System. AP&T subsequently bought out Vectren's rights for $6.3 million plus interest that was to be repaid in installments payable from net revenues of the Telecom System by issuing Series 2002A Certificates of Participation ("2002A COPs"). The 2002A COPs gave Vectren a senior lien on Telecom System net revenues until April 2009.

16.   In early 2004, the City Defendants, acting at the direction of the City,

-4-   Case No.
COMPLAINT; DEMAND FOR JURY TRIAL

caused the Authority to issue $33 million in face value of municipal revenue Bond Anticipation Notes (the "Notes) to repay the $16 million 2000B COPs, raise additional funds for the completion of the Telecom System, provide sufficient additional funds to pay the purchasers of the Notes capitalized interest until April 2009 and pay other costs and expenses associated with the issuance of the Notes.

17.  The Authority hired Stone & Youngberg to act as underwriter for the Notes. As the underwriter, Stone & Youngberg purchased the Notes from the City in April 2004 as part of the initial public distribution of the Notes and marketed them to the investing public, including Plaintiff.

18.  Stone & Youngberg had advised Osher on investments, and in particular, the purchase of municipal bonds, for over 25 years. During that period, Stone & Youngberg had at various times recommended that Osher purchase bond instruments that Stone & Youngberg believed were sound investments, and at other times, recommended against purchasing other instruments Stone & Youngberg did not view as sound. Based on its lengthy history with Stone & Youngberg (in particular a relationship with two of the firm's principals, first, Morris Greene, and then his son, Jeffrey Greene), Osher reposed complete trust and confidence in Stone & Youngberg. At the time of Osher's purchase of the Notes, detailed below, Osher had purchased many millions of dollars of securities from Stone & Youngberg.

19.  In order to market the Notes, Stone & Youngberg prepared the Official Statements. The Official Statements were sent to Osher in mid-April 2004 by Stone & Youngberg. Osher reviewed the Official Statements and discussed the purchased with Stone & Youngberg and made the April 21, 2004 purchase based on that review and discussions with Stone & Youngberg. Subsequent purchases by Osher set forth in paragraph 20 herein were based on discussions with Stone & Youngberg before each purchase in which Osher was told by Stone & Youngberg that the Telecom System was meeting projections and everything was going well. From April 2004 to March 2008, Stone & Youngberg sent Osher brokerage account statements showing valuations for the Notes at or above face value.

20.  In making the decision to purchase the Notes, Osher relied on the Official

-5-      Case No.

COMPLAINT; DEMAND FOR JURY TRIAL

1  Statements, the account brokerage statements issued by Stone & Youngberg, and further relied on
2  Stone & Youngberg's oral assurances with respect to the City Defendants' intention to honor the
3  Notes, as well as Stone & Youngberg's continuing assurances that the project was going well and
4  the Telecom System was meeting projections.

21. Osher paid a total of $8,927,571 for Notes with a face value of $8,950,000, in five tranches between April 21, 2004 and June 21, 2006, as follows:

| Date Purchased | 4/21/2004 | 6/14/2004 | 3/30/2005 | 6/14/2005 | 6/21/2006 | TOTAL |
|---|---|---|---|---|---|---|
| Face | 1,500,000 | 5,500,000 | 900,000 | 500,000 | 550,000 | 8,950,000 |
| Cost | 1,491,691.81 | 5,469,538.86 | 909,946.15 | 508,252.92 | 548,141.14 | 8,927,571 |

22. As the underwriter, Stone & Youngberg was required to conduct a due diligence investigation into the facts and circumstances surrounding the issuance of the Notes in order to determine if there is a reasonable basis for believing in the City Defendants' representations regarding the Telecom System. Stone & Youngberg also had a duty to determine the truth of the material facts to be disclosed in Official Statements, and to make full, fair and accurate disclosure in the Official Statements of all material facts that potential purchasers of the Notes needed in order to make a fully informed investment decision.

23. The City, as the entity which controlled the Authority, AP&T and APIC knew that all of the statements contained in the Official Statement were, ultimately, representations of the City, AP&T, the Authority and APIC upon which potential investors would rely, and that the City had a duty to potential investors, independent of Stone & Youngberg and Uptown, to make full and fair disclosure of all material facts.

24. Defendants knew that any facts that would indicate to a potential Note purchaser that the Telecom System was not economically feasible were material and required to be disclosed.

25. Defendants failed to disclose a number of key facts that demonstrated the Telecom System was not in fact economically feasible at the time the Notes were marketed.

-6-   Case No.
COMPLAINT; DEMAND FOR JURY TRIAL

26. Among Defendants' material omissions was the fact that the Telecom System had experienced serious cost overruns since it began operating. Not disclosed to potential purchasers, including Plaintiff, was the material fact that the Telecom System had been originally projected to achieve a profit in 2002, based on a projection of 7,875 subscribers and costs of $9.5 million. Despite exceeding the projections for its subscriber base, the Telecom System had wholly failed to meet the profit projections because of significant cost overruns, which fact was well known to Defendants. Such information concerning historical cost overruns and failed profit projections is highly material to prospective investors, as it serves as a "red flag" that there are problems with a project that are likely to be incurable.

27. Not only did Defendants fail to disclose that the Telecom System's financial performance had already fallen woefully short of expectations, in order to lull potential investors who might question the lack of financial information with respect to past performance, the Official Statements falsely represented that the reason for omitting information concerning past performance was that the System was in a "developmental stage" such that "no historic presentation of operations would be relevant to any decision to invest in the Notes." See Official Statements ("OS"), page 20.

28. Defendants also made numerous misrepresentations in the Official Statements with respect to projected rate increases. Defendants falsely represented that the City was willing and able to raise the rates charged to customers consistent with a business plan and would do so unless future competition made rate increases undesirable. These representations included, but were not limited to, the following statements:

   a. "Alameda P&T's business plan, consistent with the advice of its advisers and feasibility consultants, contemplates measured but competitive annual adjustments in most services and pricing categories over the next five years." (OS p. 19).

   b. "Because the Telecom System is in a developmental stage, for purposes of the notes and the installment payments Alameda P&T is making only a limited rate covenant although its general policy is to establish rates and charges which over the long term may enable it to recoup the average incremental cost of servicing its customers." (OS p 19).

-7-    Case No.
COMPLAINT; DEMAND FOR JURY TRIAL

29.     These representations, however, were false, in that Defendants did not have a general policy of establishing rates that would enable the Telecom System to recoup costs, but in fact had been, and continued to be, steadfast in their refusal to raise the rates charged to Telecom System customers to a level that was consistent with a business plan. At the time Defendants made these representations, the City had no intention to operate the Telecom System in a manner that would put it on a solid financial footing. Rather, the City was entrenched in an ongoing plan to provide customers (their political constituents) with service at below-market rates, which plan ensured that the Telecom System would continue to experience losses.

30.     Similarly, Defendants falsely represented that programming costs stood a reasonable chance of decreasing as a percentage of total revenue. In light of the undisclosed facts that programming costs had in fact been already subject to serious cost overruns and that, as discussed above, Defendants were keeping rates at a below-market level, the true fact was that programming costs could not reasonably be expected to decrease as a percentage of total revenue.

31.     Defendants also falsely represented that the Telecom System could reasonably be expected to compete with Comcast and other service providers on a long term basis, in that Defendants falsely stated that competitors using satellite-based systems were continuing to experience technical difficulties to which Defendants' technology was not subject. See OS page 25, stating that "other competitive technologies, internet and satellite-based television, have presented weather-related (e.g. satellite "rain fade"), internet security, installation, maintenance and program selection issues which are not generally limitations with the digital television technology offered by AP&T." The true facts, known to Defendants and unknown to the Plaintiff, were that the technical difficulties which Defendants falsely represented their competitors were continuing to experience had been resolved and these issues were no longer impairing the competitors' systems or protecting Defendants' technology from competition.

32.     The Official Statement also falsely represents that the Telecom System stood a reasonable chance of competing with Comcast and other service providers, in that it describes a number of ways in which Defendants have "chosen to deal with these competitive

-8-     Case No.

COMPLAINT; DEMAND FOR JURY TRIAL

1  forces" without disclosing that these purported "plans" had not in fact been made or implemented
2  and that these "plans" did not in fact address significant competitive hurdles to the Telecom
3  System that were known to Defendants and unknown to Plaintiff.

4      33.    At the time of Plaintiff's investment, over 40% of the households in
5  Alameda were apartments or "multiple dwelling units" (also known as "MDUs"). Defendants
6  falsely represented that the City's business plan for the Telecom System included serving this
7  vital segment of the market. The OS specifically stated that the City "plans to allocate additional
8  resources to connections with multi-family apartment and condominium structures, and where
9  feasible to become the primary provider of ... services within those structures." OS, page 15. The
10 true, undisclosed facts were that the City had decided not to pursue that segment of the market, as
11 the City had adopted a buildout strategy for the Telecom System that did not include apartments.
12 This misrepresentation was highly material: foregoing pursuit of the MDU segment of the market
13 rendered it mathematically impossible for the City to reach its projected subscriber goals, because
14 to attain the projected 22,000 customers in 2008 from the non-MDU population of Alameda
15 would have required subscribing more than 100% of the non-MDU households in Alameda.

16     34.    Similarly, the City knew, but did not disclose in the Official Statements or
17 otherwise, that of the 35% of the households in Alameda who did not have subscription
18 television, 90% of this segment of the market was deemed unreachable by the Telecom System.
19 Because of the high-quality of those households' non-cable (cost-free) TV reception, the City
20 believed it was possible for the Telecom System to attain only 10% of non-subscribing
21 households. However, the City falsely represented that all households in Alameda not presently
22 cable TV subscribers were viable potential customers of the Telecom System. Attaining the
23 City's projections was thus mathematically impossible for this reason as well, as was known to
24 the City and not disclosed to Plaintiff.

25     35.    That the Defendants' misrepresentations and material omissions were
26 knowing is evidenced by, among other things, statements made in an October 21, 2003 City
27 Council meeting in which the historical failure of the Telecom System to meet projections was
28 discussed, as well as the inability of the City to raise rates to users, and the impossibility of

-9-     Case No.
COMPLAINT; DEMAND FOR JURY TRIAL

meeting projections for new subscribers. These topics were further discussed in a November 24, 2003 City Council meeting. The City Council also discussed the fact that it did not intend to operate the Telecom System for a return on its investment. At a December 16, 2003 meeting the City Council discussed the fact that the Telecom System would likely need to be sold. None of these facts was disclosed to Plaintiff.

36.     On or about April 22, 2007, Plaintiff became aware for the first time that the Telecom System was troubled and was failing to meet projections. Subsequently, through inquiry and investigation by the parties to the Nuveen Counterclaim, Plaintiff learned of the material misrepresentations and omissions by Defendants alleged herein.

37.     On or about November 21, 2008, the Telecom System was sold to Comcast for a base purchase price of approximately $17 million, and Plaintiff was paid $4,697,141.43 in partial prepayment from AP&T on Plaintiff's Notes.

38.     Plaintiff has substantially complied with Cal. Gov't Code sections 25400 <u>et seq.</u>, or in the alternative, compliance is excused, in that the City Defendants participated in a mediation of this claim with the parties hereto and the parties to the related actions in or about August, 2008, after which the City initiated a declaratory relief action with respect to the subject matter of this action.

### FIRST CLAIM FOR RELIEF
**(Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 Promulgated Thereunder)**
**(Against All Defendants)**

39.     Plaintiff incorporates the allegations of paragraphs 1–38 as if fully set forth herein.

40.     The City, AP&T, Authority, APIC, and Stone & Youngberg directly and indirectly, singly and in concert, in connection with the offerings and sales of the Notes to Plaintiff, recklessly, knowingly and/or with an intention to defraud, made, one or more misrepresentations or failures to disclose material facts, which material facts were necessary in order to make the statements made in connection with those offerings and sales not misleading in light of the circumstances under which those statements were made all in violation of Section

-10-     Case No.
COMPLAINT; DEMAND FOR JURY TRIAL

1  10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. §
2  240.10b-5] promulgated thereunder.

3      41.    The Official Statements were the principal selling documents for the Notes
4  and were specifically intended and designed for the benefit and guidance of prospective investors
5  such as Osher. The City, AP&T, Authority, APIC, and Stone & Youngberg knew that investors
6  would rely on the information contained in said offering documents when deciding whether or not
7  to purchase the Notes.

8      42.    Osher's representatives read and reasonably relied upon the Official
9  Statement that were prepared by the City, AP&T, Authority, APIC, and Stone & Youngberg in
10  connection with the offering of the Notes.

11      43.    The purpose, effect and result of the violations of Section 10(b) of the
12  Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder by the City,
13  AP&T, Authority, APIC, and Stone & Youngberg was to induce the Plaintiff to purchase the
14  Notes, something they would not have done otherwise have done.

15      44.    As a direct and proximate result of the hereinabove-alleged violations of
16  Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated
17  thereunder, Plaintiff has suffered damages.

**SECOND CLAIM FOR RELIEF**
**(Section 20(a) of the Securities Exchange Act of 1934)**
**(Asserted in the Alternative Against the City)**

20      45.    Plaintiff incorporates the allegations of paragraphs 1–38 as if fully set forth
21  herein.

22      46.    The City directly or indirectly controlled the Authority within the meaning
23  of Section 20(a) of the Securities Exchange Act of 1934 [15 U.S.C. § 78t(a)]. The City Council
24  acted as the board of directors of the Authority, made the false and misleading statements
25  contained in the Official Statements and possessed the power to control and did control the
26  Authority's activities that constitute violations of Section 10(b) of the Securities Exchange Act of
27  1934 and SEC Rule 10b-5 promulgated thereunder.

28      47.    As a direct and proximate result of the hereinabove-alleged violations of

-11-    Case No.
COMPLAINT; DEMAND FOR JURY TRIAL

1  Section 20(a) of the Securities Exchange Act of 1934, Plaintiff has suffered damages.

**THIRD CLAIM FOR RELIEF**
**(Violation of Sections 25400, 25401, 25500, 25501 and 25504.1 of the California Corporate Securities Act)**
**(Asserted Against All Defendants)**

48.  Plaintiff incorporates the allegations of paragraphs 1–38 as if fully set forth herein.

49.  The City, AP&T, Authority, APIC, and Stone & Youngberg offered to sell and did sell the Notes in the state of California by means of written and/or oral communications which included untrue statements of material fact and omitted to state material facts necessary to make those statements made, in light of the circumstances under which they were made, not misleading in violation of §§ 25401 and 25501 of the California Corporate Securities Act.

50.  The City, AP&T, Authority, APIC, and Stone & Youngberg were persons selling or offering for sale the Notes for the purpose of inducing the purchase of the Notes and made statements that, at the time and in light of the circumstances under which the statements were made, were false and misleading with respect to material facts, or which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and which the City, AP&T, Authority, APIC, and Stone & Youngberg knew or had reasonable ground to believe were so false and misleading in violation of §§ 25400 and 25500 of the California Corporate Securities Act.

51.  To the extent that the City, AP&T, Authority, APIC, and Stone & Youngberg did not offer or sell the Notes to Plaintiff, they had knowledge of the false and misleading statements and/or omissions constituting the above-described primary violation of the California Corporate Securities Act and materially assisted in the above-described primary violation of the California Corporate Securities Act with the intent to deceive and/or to defraud in violation of § 25504.1 of the California Corporate Securities Act.

52.  By virtue of the wrongful conduct of the City, AP&T, Authority, APIC, and Stone & Youngberg, Plaintiff was induced to and did purchase the Notes.

53.  As a direct and proximate result of the hereinabove alleged violations of

-12-    Case No.
COMPLAINT; DEMAND FOR JURY TRIAL

1   the California Corporate Securities Act, Plaintiff has suffered damages.

**FOURTH CLAIM FOR RELIEF**
**(Common Law Fraud)**
**(Against Stone & Youngberg)**

54. Plaintiff incorporates the allegations of paragraphs 1–38 as if fully set forth herein.

55. Stone & Youngberg made material misrepresentations and omissions of past and present facts as more fully set forth hereinabove and knew the misrepresentations were false and misleading.

56. The misrepresentations and omissions, as hereinabove alleged, were made with the intent to induce the Plaintiff to purchase the Notes.

57. Plaintiff justifiably relied upon the representations contained in the Official Statements and the brokerage statements, and, as a direct and proximate result, has suffered substantial damages.

**FIFTH CLAIM FOR RELIEF**
**(Aiding and Abetting Common Law Fraud)**
**(Asserted Against Stone & Youngberg)**

58. Plaintiff incorporates the allegations of paragraphs 1–38 as if fully set forth herein.

59. The City, AP&T, Authority and APIC knowingly made material misrepresentations and omissions of past and present facts as more fully set forth hereinabove.

60. Defendants Stone & Youngberg was aware of this fraud and provided substantial assistance to advance the commission of the fraud.

61. As a direct and proximate result of the hereinabove-alleged wrongful acts, Plaintiff has suffered damages.

**SIXTH CLAIM FOR RELIEF**
**(Negligent Misrepresentation)**
**(Against Stone & Youngberg)**

62. Plaintiff incorporates the allegations of paragraphs 1–38 as if fully set forth herein.

63. As the underwriter, Stone & Youngberg had a duty to exercise reasonable

-13-   Case No.
COMPLAINT; DEMAND FOR JURY TRIAL

1 care in providing information to Plaintiff to ensure such information was complete and accurate
2 and not misleading, as more fully set forth hereinabove.

3     64. Stone & Youngberg knew or should have reasonably foreseen that the
4 Official Statements would be distributed to potential purchasers of the Notes, knew that such
5 investors would rely on the information provided in said offering materials in making decisions
6 whether to purchase, hold, and/or sell the Notes, and, therefore, had a duty to disclose or cause to
7 be disclosed the material facts set forth hereinabove and had a duty to ensure that the
8 representations made in the offering materials for the Notes were accurate and not misleading.
9 Stone & Youngberg knew or reasonably should have foreseen that the brokerage statements sent
10 to Plaintiff would be read and relied upon in deciding whether or not to purchase, hold, and/or sell
11 the Notes, and had a duty to ensure that the representations made as to the value of the Notes
12 were accurate and not misleading.

13     65. Stone & Youngberg breached its duty to Plaintiff by negligently making
14 the above alleged misrepresentations of and failures to disclose material facts.

15     66. Plaintiff justifiably relied upon the representations made by Stone &
16 Youngberg and, as a direct and proximate result, has suffered substantial damages.

### SEVENTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)
### (Against Stone & Youngberg)

19     67. Plaintiff incorporates by reference the allegations of paragraphs 1-38 as if
20 fully set forth herein.

21     68. At all times relevant herein Stone & Youngberg owed fiduciary duties of
22 care, loyalty, honesty and full and fair disclosure to Plaintiff based on the trust and confidence
23 reposed in Stone & Youngberg by Plaintiff.

24     69. In acting as above described, Stone & Youngberg breached its fiduciary
25 duties to Plaintiff by, among other things, recommending that Plaintiff purchase the Notes
26 notwithstanding the material facts alleged herein indicating that the Telecom System was not
27 economically viable, which facts Stone & Youngberg either knowingly concealed from Plaintiff,
28 or, recklessly failed to learn. Stone & Youngberg further breached its fiduciary duty to Plaintiff

-14-   Case No.
COMPLAINT; DEMAND FOR JURY TRIAL

by continuing to advise Plaintiff to make additional purchases of the Notes in 2005 and 2006 based on, among other things, false assurances that the City was meeting its projections for the Telecom System.

70. The conduct of Stone & Youngberg was not due to an honest error of business judgment, but rather was unreasonable, uninformed, not based on reasonable diligence, and was done in reckless disregard of the rights and interests of Plaintiff.

71. The breaches of fiduciary duty by Stone & Youngberg were the proximate cause of injury to Plaintiff as alleged herein in an amount to be determined according to proof at trial.

72. Stone and Youngberg's conduct was despicable and subjected plaintiffs to a cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to justify an award of exemplary and punitive damages.

### RELIEF REQUESTED

Plaintiff requests that the Court enter judgment in favor of Plaintiff, and against Defendants, and each of them, jointly and severally, on each of Plaintiff's Claims For Relief and award Plaintiff:

    a. Damages in an amount to be proven at trial;
    b. Prejudgment interest;
    c. Costs;
    d. Attorneys fees to the extent allowable by law; and
    e. Other and further relief as the Court deems proper.

///
///
///

-15- Case No.
COMPLAINT; DEMAND FOR JURY TRIAL

| | |
|---|---|
| Dated: April 1, 2009 | Respectfully submitted,<br><br>GOODIN, MACBRIDE, SQUERI,<br>DAY & LAMPREY, LLP<br>Robert A. Goodin<br>Francine T. Radford<br><br>By _____<br>Robert A. Goodin<br>Attorneys for Plaintiff<br>BERNARD OSHER TRUST<br>DTD 3/8/88, BERNARD A. OSHER,<br>TRUSTEE |

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial of the claims alleged herein.

| | |
|---|---|
| Dated: April 1, 2009 | Respectfully submitted,<br><br>GOODIN, MACBRIDE, SQUERI,<br>DAY & LAMPREY, LLP<br>Robert A. Goodin<br>Francine T. Radford<br><br>By _____<br>Robert A. Goodin<br>Attorneys for Plaintiff<br>BERNARD OSHER TRUST<br>DTD 3/8/88, BERNARD A. OSHER,<br>TRUSTEE |

3382/001/X108142.v1
4:36 PM

-16-    Case No.
COMPLAINT; DEMAND FOR JURY TRIAL